

1
2
3
4
5

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD JAMES BRAY, | No. C 09-01898 JSW (PR) |
| Petitioner, | |
| v. | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND CERTIFICATE OF APPEALABILITY** |
| GEORGE NEOTTI, Acting Warden, | |
| Respondent. | |
| _____/ | |

## INTRODUCTION

Petitioner Ronald James Bray, a California prisoner proceeding *pro se*, filed a habeas corpus petition pursuant to 28 U.S.C. § 2254, seeking a writ of habeas corpus. The Court ordered Respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support, and has lodged exhibits with the court. Petitioner responded with a traverse. For the reasons set out below, the petition is DENIED.

## BACKGROUND

### I.     Procedural Background

Petitioner was jointly tried with codefendants David Tamez and Ivan Gonzalez for an attack upon three men that left one man dead and the others seriously injured: Salvador Figueroa was stabbed to death, Jose Sanchez was stabbed a dozen times, and Salvador Betancourt Ceja was battered with a nanchaku that broke his nose. In July 2004, a jury in

United States District Court
For the Northern District of California

1  Sonoma County Superior Court convicted Petitioner of first-degree murder of Figueroa,

2  attempted murder of Sanchez, assault with a deadly weapon against Ceja, burglary, and

3  participation in a criminal street gang.  The jury specifically found that Petitioner inflicted

4  great bodily injury on Ceja, but rejected a criminal street gang special circumstance as well as

5  criminal street gang enhancement allegations.  Petitioner was sentenced to 25 years-to-life for

6  the first-degree murder charge, with the remaining charges being sentenced concurrently or

7  stayed.

8       Petitioner appealed his conviction, and the California Court of Appeal affirmed the

9  judgment with a modification to strike the enhancement for personal infliction of great bodily

10  injury as to the attempted murder and burglary charges.  Petitioner appealed his conviction to

11  the California Supreme Court, which denied review.  Petitioner filed the instant federal

12  petition on April 30, 2009, and was permitted to return to state court to exhaust additional

13  claims.  The case was reopened on February 24, 2011, after Petitioner filed notice that he was

14  denied relief by the state high court.

15  **II.   Factual Background**

16       The Court of Appeal summarized the facts of the case as follows:

17       The murder victim, Salvador Figueroa, shared a Cloverdale apartment with his
         brother and three other men, including one of the surviving victims, Salvador
18       Betancourt Ceja. [FN2] The other surviving victim, Jose Sanchez, was a friend
         who often visited the apartment.

19
                   FN2. Salvador Figueroa was also known as Salvador Figueroa
20                 Osequera. Salvador Betencourt Ceja is sometimes referred to in the
                   record as Salvador Ceja Betencourt. Ceja is also known by the first
21                 name Ricardo.

22       *A.    History of hostilities between the murder victim and defendant Gonzalez*

23       On June 30, 2001, Figueroa and defendant Gonzalez attended a wedding.
         Animosity arose between Figueroa and Gonzalez.  Gonzalez was reportedly
24       "looking for a fight": he made several hand gestures at Figueroa, said "things,"
         then came up "very close" and made a stabbing gesture by moving his closed
25       fist with knuckles toward the floor toward Figueroa's abdomen "as if
         [Gonzalez] was going to hit [Figueroa] with something in the stomach."
26       Figueroa's uncle, Marco Osequera, pushed defendant Gonzalez on the shoulder
         and said "[l]et's step outside." Gonzalez asked "why," and "everything settled
27       down." No physical fight occurred.

28

2

Defendant Gonzalez and Osequera did have a fight a couple months later, on August 19, 2001. Osequera was socializing and drinking beer at the Cloverdale apartment complex with about four people, including his nephew Figueroa. Defendant Gonzalez arrived with a friend to visit an occupant of one of the apartment units. Osequera was angry because Gonzalez had previously brought a drug buyer to Figueroa's apartment who turned out to be a police informant. The informant made controlled drug buys that led to a police search of Figueroa's apartment ten days earlier. Osequera, referring to the person responsible for bringing the police informant, asked Gonzalez "[w]as it you?" and Gonzalez responded "yes."

Osequera threw Gonzalez to the ground, and the men started punching each other. Gonzalez's friend separated the men, and Osequera backed away. Gonzalez jumped at Osequera, and the young men in the drinking party, which included Figueroa, chased Gonzalez and threw bottles at him. A bottle struck and cut Gonzalez's head. Gonzalez and his friend escaped in a car driven by Gonzalez's girlfriend. According to his girlfriend, defendant Gonzalez was angry and wanted to go back to the apartment complex. Gonzalez stopped at his friend's house, where the friend grabbed a bat and a couple kitchen knives. The friend said the weapons were his idea, and were just for protection against further attack. Neither Gonzalez nor his friend went back to Figueroa's apartment that night. Gonzalez and his girlfriend became embroiled in an argument because she wanted him to go to a hospital for his head injury, and Gonzalez took her car and drove off alone.

B.    Events leading up to the murder

Defendant Gonzalez was friends with defendants David Tamez and [Petitioner] Ronald Bray. Defendants Gonzalez and Bray lived in the same trailer park, as did a mutual friend named James Mahurin. In September 2001, about five days before the murder, Mahurin was walking with the three defendants in defendant Bray's trailer home. Defendant Gonzalez, in an angry tone of voice, said that he "got jumped" by about four men who attacked him because "[s]upposedly he brought an informant or something to their place." Gonzalez said he wanted "to go back there" to fight, in retaliation for being jumped. At trial, Mahurin was asked if Gonzalez told the group that anyone who went back with him to help fight could take any drugs and money they found there. Initially, Mahurin denied the statement but later admitted that Gonzalez "possibly" made that statement.

On September 18, 2001, the day of the murder, the three defendants dropped by Mahurin's trailer to drink beer and talk. Mahurin asked Gonzalez what he was going to do that night, and Gonzalez said "[s]ee what shit we can get into." Gonzalez had used that phrase before, and Mahurin understood Gonzalez to mean that he intended to "go out and have fun." Defendants left Mahurin's trailer together around dusk, and walked toward Bray's trailer.

Defendant Bray's mother returned home from work in the early evening of September 18, 2001, to find her son drinking with his girlfriend and defendants Gonzalez and Tamez. The group talked for a couple of hours, and discussed the then-recent-9-11 terrorist attack on the World Trade Center in New York City. Gonzalez remarked to Bray's mother that "we need to kill [the terrorist Osama] [b]in Laden." Gonzalez also said, "[d]on't worry, [b]in Laden will get his just like Salvador will." [FN3]

FN3. The murder victim's name was Salvador Figueroa. Bray's mother told a police detective about defendant Gonzalez's statement about "Salvador" before she learned the victim's name.

The three defendants left the Bray trailer, and met up at Gonzalez's home. According to Gonzalez's girlfriend, Evangelina Arana, Gonzalez asked to borrow her car, and she said no because he was not insured. Arana offered to take Gonzalez wherever he wanted to go. Gonzalez said he wanted to go to a store. Arana started driving toward the store with the three defendants in the car but Gonzalez redirected her past the store to the victims' apartment building.

Two of the victims, Figueroa and Sanchez, had been playing basketball that night with other men and returned to the apartment complex around 8:30 p.m. Sanchez saw a car in the parking lot with four occupants: a female driver and three passengers wearing red bandanas covering their faces and hooded sweaters with the hoods pulled over their heads. The driver Arana testified that defendant Gonzalez was playing with his folding work knife as he sat in the car, opening and closing the knife.

Sanchez testified that the car drove up in front of the victims, and the car occupant sitting in the rear on the passenger side yelled "puro norte" at the victims and made a hand gesture like a gun – with the thumb up, the first two fingers pointing straight out, and the other two fingers pulled in. According to the driver Arana, defendant Bray was in the rear seat on the passenger side. Arana testified that she saw Bray "thr[o]w a four" by holding out four fingers but she did not notice any other hand gestures. Arana also testified that defendant Gonzalez taunted the victims, yelling "where are your friends?" Bray yelled out of the car "What's up, putos?" Puto is a derogatory Spanish word that was variously translated at trial.

C.      The attack and murder

Defendant Gonzalez told Arana to park the car on a side street, and all three defendants left the car and moved together toward the victims' apartment. Arana testified that defendant Tamez picked up a stick while walking toward the apartment. Sanchez saw Gonzalez and two other men approaching, and one of Gonzalez's companions had a small wooden "bat" or club in his hand, about 14 inches long. Victims Sanchez and Figueroa ran inside the apartment pursued by the three defendants. The victims ran through the living room and into a bedroom. Sanchez tried to shut the bedroom door against the force of all three defendants, who were pushing it open. One of the assailants reached inside and hit Sanchez in the face with the bat. The force of the blow caused Sanchez to release his grip on the door, and two assailants came inside the dark bedroom.

Sanchez testified that one of the two assailants went after him, and the other attacked Figueroa. The third man stood in the bedroom doorway. The man who went after Sanchez stabbed him repeatedly. Sanchez said another man stabbed Figueroa. But it was dark in the bedroom, and Sanchez was against a wall and could not always see what was happening to Figueroa across the room. It was also too dark in the bedroom for Sanchez to see which of the three defendants entered the bedroom, or who stabbed him. [FN4] Sanchez was stabbed 11 or 12 times. He suffered stab wounds to his neck, back, and arm. Some of the wounds were about five inches in length and penetrated down through the skin

and fatty tissue to the muscle. Sanchez's lung was lacerated and chest blood vessels were severed. His injuries were life threatening, required emergency surgery, and necessitated hospitalization for a week.

> FN4. At trial, Sanchez initially testified that defendant Gonzalez was one of the two men who entered the bedroom. But, on cross-examination, Sanchez admitted that he did not know who entered the bedroom. Sanchez also explained that, when the police asked him "who did it" and he said Gonzalez, Sanchez meant that Gonzalez was an attacker, not that Gonzalez stabbed him.

Figueroa did not survive the attack. He died from multiple stab wounds to his chest and neck. Figueroa was stabbed eight times, including twice in the heart. One of the fatal stab wounds penetrated about six inches. A pathologist testified that there are few ways to determine whether stab wounds are made by one or more instrument, and that it was not possible to say whether Figueroa's wounds were inflicted by one knife or more. The pathologist opined that a single-edged blade caused the deeper stab wounds because the wounds are rounded on one side and bluntly squared off on the other side. The deepest wound required a blade length of at least four and one-half inches. The shallower wounds are inconclusive; they could have been made with either a double-edged knife or a single-edged knife with a tapered tip. No wounds were made with a serrated knife. Figueroa also suffered blunt trauma, bruising injuries consistent with being struck by something. Bruising was sustained on Figueroa's head, shoulder and rib areas and showed a distinct, repeating ridge patter in an "L" shape approximately six inches by one inch.

Figueroa's roommate, victim Ceja, was asleep in a different bedroom when the attack began. Ceja awoke to the sound of fighting and escaped through a bedroom window. Once outside, Ceja saw a man leave the apartment and come toward him with a nunchaku, which is a weapon made of two sticks connected with a chain. At trial, defendant Bray was identified as the owner of a nunchaku by several people.

The assailant struck Ceja in the face and on the arm with the nunchaku. The force of the blow to Ceja's face was so great that it lacerated his face, broke his nose, and required a physician to scrape the weapon's paint off Ceja's nasal bone. In addition to the man who attacked Ceja, Ceja also reported seeing two other men leave the apartment.

A neighbor heard noise coming from the victims' apartment, and Ceja ran up with a bloody nose and said he had been "beaten up with some chukkas." The neighbor saw a man wearing a "kerchief" over his face fleeing toward the street, and the neighbor threw a lunch pail at the assailant but missed hitting him. The assailant stopped and picked up the lunch pail and the neighbor ran back inside his apartment. The lunch pail broke through the window.

The three defendants turned to Arana's car. Defendant Bray was carrying a nunchaku and defendant Gonzalez had his work knife, with blood on it. Arana drove away, and Gonzalez told Bray that Gonzalez "had gotten them back." Bray replied that he "had hit somebody in the face with the nunchakas [sic]." Defendant Tamez said that he "kicked" and "hit somebody with a stick."

///

5

*D.*    *The arrests*

Arana drove defendants Tamez and Bray to Bray's trailer home, then took Gonzalez to work at the Asti Winery. Gonzalez operated a wine filter, where a cutting tool is useful for opening bags. But Gonzalez did not take his work knife with him that night. Gonzalez told Arana to "get rid of" his knife, and she drove to Lake Sonoma and dropped the knife in the water. Victim Sanchez identified Gonzalez as one of the assailants, and the police arrested Gonzalez at work. Gonzalez did not have his customary work knife on him when he was arrested.

Gonzalez's home was searched and the police found, in his bedroom, gang-related items including red clothing (Norteno gangs wear red clothes), photographs of people "throwing" hand signs associated with the Norteno gang, and a videotape entitled "Connected by Honor," a video made by and for Norteno gang members that glorifies gang life. The police questioned Gonzalez's girlfriend, Arana, and she identified defendants Bray and Tamez as Gonzalez's accomplices in the attack.

The police went to Bray's home with a search warrant, and he refused their demands to come outside. The police kicked in the door. The police noticed abrasions on Bray's knuckles. Bray's girlfriend made the same observation the night before when Bray turned home with Tamez, and also noticed that Bray had a swollen lip. Bray told his girlfriend that he had been in a fight in Cloverdale.

The police searched Bray's bedroom and found a plastic and foam nunchaku; no wooden nunchaku was recovered. The police also discovered shoes with Tamez's blood on them, a red bandana, and two knives. One knife, a "survival type" serrated knife with a compass on top, was found in a safe in the closet in Bray's bedroom. Another knife, found in a dresser drawer, was a single-edged, tapered-blade knife with a multi-colored handle and brown sheath. "VHN" was carved into the sheath with "X" and "4" scratched in between the three letters. "VHN" is a known designation for the Varrio Healdsburg Norteno gang, and X4 is a gang symbol for 14, a number used by the Norteno gang (because the letter "N" of Norteno is the 14th letter of the English alphabet). Bray's bedroom also contained a compact disk with Norteno rap music, a Norteno cartoon, and photographs of Bray "throwing" gang signs and socializing with known gang members.

The police also arrested defendant Tamez the morning after the murder, and searched the house where they located him. The police found two wooden dowels tied with a red bandana, and other items of red clothing. There was a wooden sign on the wall with "H-Town" in red. "H-Town" is a Norteno gang. The "H" stands for Healdsburg, a town near Cloverdale. A search of the residence also found photographs depicting known gang members, billy clubs, and a newspaper article reporting a Norteno attack on a rival gang member.

At the time of his arrest, Tamez had several gang tattoos on his body: a joker figure holding a smoking gun (Tamez's gang moniker is "Joker"); the number 14; "WSN" (for Westside Windsor, a Norteno gang); and the word "Norte" in large letters across his upper back. Norte is short for Norteno, meaning Northerner. The police also saw that Tamez had an open, two-inch cut on his left forearm. At trial, the treating physician testified that the "most likely" cause of the injury was "a knife sharp instrument." Tamez told the arresting

**United States District Court**
For the Northern District of California

police officers that he had cut himself the night before while on the living room couch, and pointed the police to a serrated kitchen knife on the floor next to the couch. Tamez said he kept the knife next to the couch for protection, in case someone broke into the house. The knife was photographed but not collected as evidence.

A trail of blood was found at the murder scene that ran from the apartment building to the street. It was Tamez's blood. Tamez's blood and fingerprint were also found in Arana's car.

### E.    Expert testimony on gangs

Detective James Lane of the Santa Rosa Police Department testified as an expert on criminal street gangs. He described the formation in California of the rival Surenos (Southerners) and Nortenos (Northerners) gangs, and the various symbols they use to identify themselves. Detective Lane explained that a gang's ability to instill fear is the source of its power, so a gang works hard to maintain its reputation for violence. Gang members will retaliate if one of their members loses a fight in order to retain the gang's reputation. Detective Lane described several recent crimes committed by the Norteno gang, including shootings and stabbings in rival gang territory.

The detective opined that defendants were Norteno gang members at the time of the September 2001 attack at the Cloverdale apartment. Detective Lane based his opinion about defendant Tamez on a number of points, including the reports of other police officers that Tamez identified himself to those officers as a Norteno gang member in 1996, 1997, and 1999. The detective also noted that Tamez associated with, and had been previously arrested with, known Norteno gang members. Tamez also had gang tattoos on his body (including the word "Norte" written in large letters across his back), dressed in red clothing, and was arrested in a house containing gang paraphernalia and billy clubs that could be used as weapons. Detective Lane observed that it was common for gang members "to have weapons available inside their houses."

In concluding that defendant Bray was a gang member, the detective relied upon Bray's previous police detentions and contacts from 1998 to 2001. On two occasions in 1998, Bray was stopped in vehicles containing known Norteno gang members. On one of those occasions, Bray and a Norteno gang member were seen leaving the area of a reported fight. In 1999, Bray was again stopped by the police, and cited for alcohol violations, while in the company of a Norteno gang member. That same year, Bray was assaulted by Sureno gang members. Bray was arrested in both 2000 and 2001, and each time he was wearing red clothing and armed with a knife. In early 2000, Bray admitted to the police that he was an associate of the H-Town Norteno gang but had not been "jumped in," meaning that he was a gang participant but not yet a full-fledged member. The detective further noted that Bray had knives and gang paraphernalia in his bedroom at the time of his arrest.

Detective Lane testified that defendant Gonzalez had numerous police contacts since 1996, and was often in the company of known Norteno gang members. In 1996, Gonzalez painted gang graffiti, including "Norte 14." In 1996 and 1999, Gonzalez was with known gang members when arrested for assault. In the latter incident, Gonzalez stabbed a Sureno gang member. In 1999, Gonzalez was with a Norteno gang member who scratched "XIV" on a car. In 2000, Gonzalez reportedly struck a woman for dating a Sureno, and was arrested in

7

the presence of Norteno gang members. The detective also observed that Gonzalez, like Bray, had gang paraphernalia in his home at the time of his arrest in the present case.

Defendant Bray presented his own expert on criminal street gangs, James Hernandez, a professor of criminal justice. Professor Hernandez opined that defendants were not active participant in a criminal street gang. The professor testified that "part of youth is looking for an identity," and being a Norteno is an identity. Some individuals claiming to be Nortenos are "hard core guys" who are actual gang members committing street crimes but others "are just kind of doing their thing" and adopting an identity without engaging in criminal activity. Professor Hernandez maintained that the general designation Norteno is not a gang; only specific subsets are gangs. The professor acknowledged that defendant Bray previously claimed association with a specific Norteno subset based in Healdsburg but opined that Bray was not an active gang member and based that opinion on the fact that Bray had since moved away to a different town. The professor cited a statistic that 69 percent of individuals in a gang stay for a year or less. Professor Hernandez also opined that the attack at the Cloverdale apartment was the result of a personal vendetta.

On cross-examination, the professor conceded that the Norteno subset Westside Windsor is a gang and opined that defendant Tamez was a gang member when he was tattooed with that gang's name. However, Professor Hernandez emphasized that "people change." On a similar basis, the professor dismissed evidence that Bray had a knife sheath marked with the name of a Norteno subset. Professor Hernandez suggested that it was not clear when the sheath was carved with the gang name. As for defendant Gonzalez, the professor concluded that Gonzalez identifies with the Nortenos but found "no structural involvement with a subgroup."

*F.    Verdict*

A jury convicted all three defendants of first degree murder of Figueroa (§ 187, subd. (a); count one); attempted premeditated murder of Sanchez (§§ 187, subd. (a), 664; count two); assault with a deadly weapon upon Ceja (§ 245, subd. (a)(1); count four); burglary (§459; count five); and participation in a criminal street gang (§ 186.22, subd. (a); count six). The jury found that each defendant personally inflicted great bodily injury on Sanchez (counts two and five) but found only defendant Bray liable on that enhancement for the assault upon Ceja. (§12022.7, subd. (a).) The jury rejected allegations that the murder, attempted murder, assault, and burglary were committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) The jury likewise rejected the special circumstance allegation that Figueroa's murder was carried out to further the activities of a criminal street gang. (§ 190.2, subd. (a)(22).)

*G.    Sentencing*

All defendants are serving life terms. . . .

[¶]...[¶]

Defendant Bray was sentenced to 25 years to life for Figueroa's murder (count one). The court stayed the burglary term and made all other terms concurrent: a

concurrent sentence of life with possibility of parole for the attempted murder of Sanchez with three additional years for inflicting great bodily injury (count two); a concurrent term of four years for the assault upon Ceja with three additional years for inflicting great bodily injury (count 4); and a concurrent three-year sentence for gang participation (count six).

In selecting concurrent terms, the court explained that it found Bray to be "the least culpable of the three" defendants. The court referred to Bray as "an intoxicated tag-a-long" and concluded that "[t]here was no evidence that Bray ever had a knife or that he stabbed anybody." However, the court denied a defense motion to strike the great bodily injury enhancement for the attempted murder of Sanchez.

Ans. Ex. 6 at 2-12.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority under the first clause of Section 2254(d)(1) only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority under the second clause of Section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in

United States District Court
For the Northern District of California

9

United States District Court
For the Northern District of California

1  its independent judgment that the relevant state-court decision applied clearly established

2  federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be

3  "objectively unreasonable" to support granting the writ. *See id.* at 409.

4       "Factual determinations by state courts are presumed correct absent clear and

5  convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not

6  altered by the fact that the finding was made by a state court of appeals, rather than by a state

7  trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082,

8  1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and

9  convincing evidence to overcome section 2254(e)(1)'s presumption of correctness;

10  conclusory assertions will not suffice. *Id.* Under 28 U.S.C. 2254(d)(2), a state court decision

11  "based on a factual determination will not be overturned on factual grounds unless

12  objectively unreasonable in light of the evidence presented in the state-court proceeding."

13  *Miller-El*, 537 U.S. at 340.

14                          **ANALYSIS**

15       Petitioner presents the following claims as grounds for federal habeas relief: (1) the

16  trial court violated his right to due process when it denied Petitioner's midtrial motion for

17  acquittal on all gang-related allegations based on insufficiency of the evidence; (2) the trial

18  court erred when it failed to sua sponte dismiss the gang-related charges; (3) he received

19  ineffective assistance of trial counsel; (4) he received ineffective assistance of appellate

20  counsel; (5) the trial court gave improper jury instructions with respect to the gang

21  participation charge; (6) trial and appellate counsel were ineffective for failing to raise the

22  instructional error claim; (7) the jury was improperly permitted to consider evidence of gang

23  participation which was insufficient and prejudicial; (8) there was insufficient evidence to

24  support the gang participation allegation; (9) failure to exclude evidence of knives violated

25  due process; and (10) the cumulative effect of these errors rendered the trial unfair.

26  **I.    Insufficient Evidence (Claims 1, 2 and 8)**

27       Under claims 1, 2 and 8, Petitioner attacks the sufficiency of the gang evidence

28  admitted to prove the gang-related charges, which included the substantive gang participation

                                  10

1  charge, the criminal street gang special circumstance, and criminal street gang enhancement

2  allegations.

3      The Due Process Clause "protects the accused against conviction except upon proof

4  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

5  charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

6  evidence in support of his state conviction cannot be fairly characterized as sufficient to have

7  led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a

8  constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven,

9  entitles him to federal habeas relief, see id. at 324.

10     The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal

11 habeas proceedings . . ." *Coleman v. Johnson*, No. 11-1053, slip op. at 1 (U.S. May 29,

12 2012) (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as

13 factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-

14 grained factual parsing" to find that the evidence was insufficient to support petitioner's

15 conviction).  A federal court reviewing collaterally a state court conviction does not

16 determine whether it is satisfied that the evidence established guilt beyond a reasonable

17 doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993);

18 *see, e.g., Coleman*, slip op. at 7 ("the only question under *Jackson* is whether [the jury's

19 finding of guilt] was so insupportable as to fall below the threshold of bare rationality").  The

20 federal court "determines only whether, 'after viewing the evidence in the light most

21 favorable to the prosecution, any rational trier of fact could have found the essential elements

22 of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443

23 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a

24 reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*,

25 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th Cir.), *amended*, 768 F.2d 1090

26 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048, *and cert. denied*, 475 U.S. 1049 (1986); *Bashor

27 v. Risley*, 730 F.2d 1228, 1239 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).

28     The Court of Appeal found that there was sufficient evidence to support the

11

conviction for gang participation:

> Defendants Tamez and Bray argue that their conviction for gang participation should be reversed because there was insufficient evidence to establish the statutorily required element of knowledge. Bray argues (and Tamez joins in the argument) that the People failed to show that defendants "actively participate[d] in any criminal gang *with knowledge* that its members engaged in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (a), italics added.) The argument is meritless.

> The People were entitled to rely on circumstantial evidence to prove defendants' guilt. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) Direct evidence of a defendant's state of mind is seldom available, and avenues for providing evidence in this area are narrowed by rules precluding an expert witness from expressing opinions on ultimate issues such as whether a defendant harbored subjective knowledge. (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 658.) Gang participation convictions have been upheld on circumstantial evidence less weighty than the evidence presented here. In *People v. Casteneda* (2000) 23 Cal.4th 743, 753, the court found sufficient evidence of gang participation "through evidence of the crimes defendant here committed, his many contacts on previous occasions with the Goldenwest criminal street gang, and his admissions by bragging to police officers on those occasions of gang association or membership...." Similarly, in *In re Jose P.* (2003) 106 Cal.App.4th 458, 468, defendant's gang participation was shown by two prior convictions, prior admissions to police officers that he associated with a Norteno gang, and several contacts with Norteno gang members (sometimes, while wearing red).

> The evidence of knowing gang participation is stronger in this case, especially as to defendant Tamez. On the morning after the stabbings, Tamez was arrested in a residence that Detective Lane characterized as a "[g]ang hang out[]." The house contained two wooden dowels tied with a red bandana, and many items of red clothing. There was a wooden sign on the wall with "H-Town" in red, signifying a Norteno gang subgroup. The house also contained photographs depicting known gang members throwing gang signs, billy cubs commonly used in gang attacks, and a newspaper article reporting a Norteno knife attack on a rival gang member.

> [¶...[¶]

> The evidence of defendant Bray's knowing gang participation is arguably less [than Tamez], but still substantial. Witnesses testified that it was Bray who used gang slogans and gestures immediately preceding the attack. When defendants drove up to the victims' apartment building, Bray yelled "puro norte" at the victims and made a hand gesture like a gun – with the thumb up, the first two fingers pointing straight out, and the other two fingers pulled in. Bray also "threw a four" by holding out four fingers.

> When Bray was arrested the morning after the attack, a search of his bedroom revealed a red bandana and two knives. One of the knives, found in a dresser drawer, was a single-edged, tapered-blade knife with a brown sheath. "VHN" was carved into the sheath, with "X" and "4" scratched in between the three letters. "VHN" is a known designation for the Varrio Healdsburg Norteno gang, and X4 is a gang symbol for 14, a number used by the Norteno gang.

United States District Court
For the Northern District of California

Bray's bedroom also contained a compact disk with Norteno rap music, a Norteno cartoon, and photographs of Bray "throwing" gang signs and socializing with known gang members.

Detective Lane's opinion that Bray was an active gang participant was founded, in part, on reports of Bray's association with Norteno gang members. Bray was arrested in both 2000 and 2001, and each time he was wearing red clothing and armed with a knife. Like Tamez, Bray was also a self-identified gang participant. In early 2000, Bray admitted to the police that he was an associate with the H-Town Norteno gang. At that time, Bray said "he had been hanging out with Norteno gang members for a year and a half or so." The evidence of Bray's knowing gang participation is plainly sufficient to support the jury's verdict.

Pet. Ex. A at 31-33.

### A.    Claim 1 - Denial of Midtrial Motion for Acquittal

Petitioner claims that there was insufficient evidence to support the gang-related allegations, and that therefore the trial court erred in failing to grant his midtrial motion for an acquittal. Petitioner argues that the jury recognized the weakness of his gang membership by rejecting the gang special circumstance and gang enhancement allegations. Pet. Attach. at 8. He asserts that his criminal history consisted of one citation for an alcohol violation and one DUI arrest, no involvement in any crimes committed by gang members or for the benefit of any gang, and that there was no evidence that the victims in this case were themselves gang members. *Id.* at 5-6. Petitioner attacks the prosecution's showing of gang membership as overly broad, asserting that the prosecution was required to show that Petitioner was an active member of the local gang sect instead of the larger representative group of Sonoma County Nortenos. *Id.* at 19-20. He concludes that the gang-related evidence submitted by the prosecution was otherwise "irrelevant and prejudicial" to the jury's fair consideration of the remaining charges. *Id.* at 9.

In answer, Respondent contends that under the AEDPA standard of review, the relevant inquiry is "'only whether the state court's decision was contrary to or reflected an unreasonable application of *Jackson* to the facts of a particular case.'" Ans. at 10-11. Respondent is correct. Here, after viewing the evidence in the light most favorable to the prosecution, the Court concludes that any rational trier of fact could have found the essential elements of gang participation beyond a reasonable doubt. *See Payne*, 982 F.2d at 338. The

13

state appellate court was not unreasonable in finding that there was sufficient evidence of

Petitioner's gang participation to support the conviction, which included the following: (1)

witnesses testified that Petitioner used gang slogans and gestures immediately preceding the

attack, *i.e.*, Petitioner yelled "puro norte" at the victims and made a hand gesture like a gun,

and "threw a four" by holding out four fingers; (2) a search of Petitioner's bedroom revealed

a red bandana and two knives, one of which bearing gang signs carved into the sheath; and

(3) Petitioner's bedroom also contained a compact disk with Norteno rap music, a Norteno

cartoon, and photographs of him "throwing" gang signs and socializing with known gang

members. *See supra* at 12-13. The circumstantial evidence and inferences drawn from this

evidence are sufficient to sustain Petitioner's conviction. *See Walters v. Maass*, 45 F.3d

1355, 1358 (9th Cir. 1995). Lastly, Petitioner's claim that the prosecution was required to

prove that he was a member of a local sect rather than the larger organization under

California law fails to state a federal claim because it is strictly a matter of state law. The

Supreme Court has repeatedly held that federal habeas writ is unavailable for violations of

state law or for alleged error in the interpretation or application of state law. *See Swarthout

v. Cooke*, 131 S. Ct. 859, 861-62 (2011); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Accordingly, the state courts' alleged misapplication of its own laws is not a matter

warranting federal habeas relief.

Respondent further asserts that the issue is not necessarily whether there was

sufficient evidence to prove the gang enhancement allegations because the jury did not find

the gang enhancement and special circumstance allegations true. Respondent contends that

Petitioner's greater burden here is to show that the admission of the gang evidence was "so

inflammatory on its own that his trial was fundamentally flawed." Ans. at 11. The

admission of evidence is not subject to federal habeas review unless a specific constitutional

guarantee is violated or the error is of such magnitude that the result is a denial of the

fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021,

1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S.

839 (1986). The Supreme Court "has not yet made a clear ruling that admission of irrelevant

United States District Court

For the Northern District of California

1    or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

2    issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding

3    that trial court's admission of irrelevant pornographic materials was "fundamentally unfair"

4    under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly

5    established Federal law under § 2254(d)). Such is the case here, where Petitioner not only

6    fails to show that the admission of irrelevant or overtly prejudicial evidence of gang

7    participation rendered his trial "fundamentally unfair," but that it was also contrary to or an

8    unreasonable application of clearly established federal law. Furthermore, only if there are no

9    permissible inferences that the jury may draw from the evidence can its admission violate due

10   process. *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). In the case at bar,

11   the jury could infer from the evidence of gang membership that Petitioner was an active gang

12   participant at the time of the incident to support the gang related charges. Accordingly, the

13   trial court did not err by denying Petitioner's midtrial motion for an acquittal, and the state

14   courts' rejection of this claim was not contrary to, nor an unreasonable application of,

15   Supreme Court precedent.

16       **B.     Claim 2 - Failure to *Sua Sponte* Dismiss Charges**

17       Petitioner's second claim is that due process required that the trial court *sua sponte*

18   dismiss the gang allegations and order the gang evidence stricken after the defense presented

19   its own expert testimony. Pet. Attach. at 31. Petitioner concedes that his defense attorney

20   made no explicit motion for an acquittal after the defense rested, but asserts that it was

21   nevertheless the duty of the trial court to dismiss the charges when the prosecution failed to

22   meet its burden. *Id.*

23       After AEDPA, a federal habeas court applies the standards of *Jackson* with an

24   additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

25   Generally, a federal habeas court must ask whether the operative state court decision

26   reflected an unreasonable application of *Jackson* to the facts of the case. *Coleman*, slip op. at

27   2; *Juan H.*, 408 F.3d at 1275 (quoting 28 U.S.C. § 2254(d)). Thus, if the state court affirms

28   a conviction under *Jackson*, the federal court must apply § 2254(d)(1) and decide whether the

United States District Court

For the Northern District of California

state court's application of *Jackson* was objectively unreasonable. *See McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010); *Sarausad v. Porter*, 479 F.3d 671, 677-78 (9th Cir. 2007). To grant relief, therefore, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, *i.e.*, that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-965 (9th Cir. 2011).

Respondent asserts that the defense's use of expert testimony to create doubt as to the sufficiency of evidence does not justify dismissal of the charges under *McDaniel v. Brown*. Ans. at 16. In *Brown*, the defendant was convicted of rape following a trial in which the prosecution presented DNA evidence showing a 1 in 3,000,000 chance that someone other than defendant could have been responsible. The defendant later submitted contrary evidence in his federal habeas petition showing that the chance of a random match was significantly lower. Based on this evidence, the district court reversed the conviction. The Supreme Court overturned the habeas grant and reinstated the conviction, holding that the contrary expert testimony presented by the defendant in his habeas petition did not justify dismissal of the charges under *Jackson* since it merely indicated that "two experts do not agree with one another," nor did it conclusively prove that the prosecution's expert testimony was so inherently unreliable as to be unworthy of belief by any reasonable juror. *McDaniel v. Brown*, 130 S. Ct. at 673.

Respondent argues that Petitioner's claim involves the same "battle of experts" as in *Brown*: the experts for the prosecution and defense presented contrary testimony on whether a criminal street gang could be defined broadly enough to include all 1300 Norteno members in Sonoma County or whether it should be confined to a much smaller subset. The experts also disagreed on whether Petitioner had the requisite amount of knowledge of the predicate crimes such that a jury could find that Petitioner had knowledge that the gang "'engage[d] in, or had engaged in, a pattern of criminal gang activity.'" Ans. at 17, citing § 186.22, subd. (a). Respondent asserts that the expert testimony presented by the defense did not render anything stated by the prosecution's expert witness "inherently impossible or so unreliable as to be

1  unworthy of presentation to the factfinder, and thus, could not alter the possible findings the

2  jury could have made in favor of conviction." *Id.* at 17-18.

3       The evidence on which the prosecution's expert witness based his opinion on

4  Petitioner's gang membership included the following: (1) Petitioner's previous police

5  detentions and contacts from 1998 to 2001 which linked him with known gang members and

6  gang activity; (2) Petitioner's admission the year before the incident that he was an associate

7  of the H-Town Norteno gang; and (3) the presence of knives and gang paraphernalia in

8  Petitioner's bedroom at the time of his arrest. *See supra* at 7.  In contrast, the defense expert

9  witness opined that Petitioner was not an active participant in criminal street gang,

10  characterizing Petitioner's connection with the Norteno gang as a youthful attempt to claim

11  an identity. *Id.* at 8.  The expert acknowledged that Petitioner had previously claimed

12  association with a specific Norteno subset based in Healdsburg, but opined that Petitioner

13  was not an active gang member based on the fact that Petitioner had since moved away to a

14  different town. *Id.*  The expert also opined that the attack at the Cloverdale apartment was

15  the result of a personal vendetta rather than gang activity. *Id.*  On cross-examination, the

16  defense expert discounted the evidence that Petitioner had a knife sheath marked with the

17  name of a Norteno subset, and suggested that it was not clear when the sheath was carved

18  with the gang name. *Id.*

19       Viewing the evidence in the light most favorable to the prosecution, this Court is not

20  convinced that the expert testimony presented by the defense so undermined the evidence

21  presented by the prosecution to justify dismissal of the charges.  The Court in *Brown*

22  concluded that a reviewing court "'faced with a record of historical facts that support

23  conflicting inferences must presume – even if it does not affirmatively appear in the record –

24  that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to

25  that resolution.'" *Brown*, 130 S. Ct. at 673, quoting *Jackson*, 443 U.S. at 319.  Here, the

26  Court must presume that the jury resolved the conflicts between the expert witnesses'

27  testimonies in favor of the prosecution in finding Petitioner guilty of the broad substantive

28  charge of gang participation.  As Respondent points out, the fact that the jury acquitted

United States District Court
For the Northern District of California

1  Petitioner on the gang special circumstance and enhancement allegations while finding him
2  guilty of the substantive gang participation charge indicates that it was able to weigh the
3  relevant testimony of the experts and appropriately assess the weight and credibility of each.
4  For example, the jury was free to weigh the relevance and credibility of the defense expert
5  witness's opinion that Petitioner could claim a Norteno identity while not actually being a
6  member against the evidence of Petitioner's past criminal activity presented by the
7  prosecution's expert witness, and could reasonably conclude that the latter's testimony was
8  more convincing.  Lastly Petitioner's argument that the jury's guilty verdict on the
9  substantive gang charge and concurrent rejection of the special circumstance and
10  enhancement allegations indicates that the jury was unduly prejudiced by the gang evidence
11  is not convincing.  Based on the evidence presented, it was reasonable for the jury to reject
12  the latter charges which required specific intent, *i.e.*, that the attacks were committed for the
13  benefit of a criminal street gang or to further the activities of a criminal street gang, while at
14  the same time finding Petitioner guilty of gang participation which involves mere knowledge
15  of criminal gang activity. Pen. Code. § 186.22, subd. (a); *see infra* at 18-19.  Accordingly, the
16  state courts' rejection of this claim was not contrary to, nor an unreasonable application of,
17  Supreme Court precedent.
18  **C.    Claim 8 - Insufficient Evidence of Knowledge**
19       Petitioner claims that there was insufficient evidence to prove "the knowledge
20  element" of the gang-participation conviction. Pet. Attach. at 42.  In other words, Petitioner
21  claims that there was insufficient evidence that he acted with knowledge that his
22  codefendants, as gang members, were "engage[d] in, or have engaged in, a pattern of
23  criminal gang activity." § 186.22, subd. (a).
24       This claim is also without merit.  In rejecting this claim, the state appellate court
25  found that there was "substantial" evidence of Petitioner's "knowing gang participation."
26  *See supra* at 12-13.  Witnesses testifed at trial that Petitioner used gang slogans and gestures
27  immediately preceding the attack, that he yelled  "puro norte" at the victims and made a hand
28  gesture like a gun, and that he also "'threw a four" by holding out four fingers." *Id.*  There

18

1  was also evidence of gang association found in Petitioner's apartment, including a red

2  bandana, a knife with gang insignia carved into the sheath, a compact disk with Norteno rap

3  music, a Norteno cartoon, and photographs of Petitioner "throwing" gang signs and

4  socializing with known gang members. *Id.* Lastly, there was the testimony of the

5  prosecution's expert witness who opined that Petitioner was an active gang participant based

6  largely on reports of Petitioner's association with Norteno gang members and his criminal

7  record. *Id.*

8       Circumstantial evidence and inferences drawn from that evidence may be sufficient to

9  sustain a conviction. *Walters v. Maass*, 45 F.3d at 1358. "*Jackson* leaves juries broad

10  discretion in deciding what inferences to draw from the evidence presented at trial requiring

11  only that jurors 'draw reasonable inferences from basic facts to ultimate facts." *Coleman*,

12  slip op. at 6. Here, there was sufficient circumstantial evidence in the record, particularly

13  Petitioner's comments and gesticulations just prior to the attack, from which the jury could

14  reasonably infer that Petitioner had knowledge that his associates were engaged in a pattern

15  of criminal activity, and that the attack at the apartment was a part of such activity. The state

16  courts did not unreasonably apply Supreme Court precedent in rejecting this claim.

17  **II.     Ineffective Assistance of Counsel (Claims 3 and 4)**

18       Petitioner claims that his trial counsel rendered ineffective assistance when he failed

19  to make every argument presented under claim 1, *i.e.*, with respect to Petitioner's midtrial

20  motion for an acquittal, or when he failed to renew the motion after the defense rested.

21  Specifically, Petitioner alleges under claim 3 that any procedural default of claims 1 and 2 on

22  appeal was due to his trial counsel's deficient performance. Petitioner claims under claim 4

23  that his appellate counsel rendered ineffective assistance for failing to advance claims 1, 2

24  and 3 on appeal.

25       In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner

26  must show: first, that counsel's performance was deficient, *i.e.*, that it fell below an

27  "objective standard of reasonableness" under prevailing professional norms. *Strickland v.*

28  *Washington*, 466 U.S. 668, 687–88 (1984). Second, he must establish that he was prejudiced

United States District Court
For the Northern District of California

19

United States District Court

For the Northern District of California

1   by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for

2   counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

3   at 694. A reasonable probability is defined as a probability sufficient to undermine

4   confidence in the outcome. *Id.* Judicial scrutiny of counsel's performance must be highly

5   deferential, and a court must indulge a strong presumption that counsel's conduct falls within

6   the wide range of reasonable professional assistance. *Id.* at 689.

7      **A.**    **Claim 3 - Trial Counsel's Performance**

8      Petitioner was not prevented from raising claims 1 and 2 on the merits either in direct

9   appeal or in habeas. Accordingly, it cannot be said that Petitioner was prejudiced by trial

10   counsel's alleged deficient performance. A court need not determine whether counsel's

11   performance was deficient before examining the prejudice suffered by the defendant as the

12   result of the alleged deficiencies. *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52

13   F.3d 1465, 1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider

14   whether counsel's conduct was deficient after determining that petitioner could not establish

15   prejudice), *cert. denied*, 516 U.S. 1124 (1996). Furthermore, as discussed above, the Court

16   has determined that claims 1 and 2 are without merit. Trial counsel cannot have been

17   ineffective for failing to raise a meritless motion. *Juan H. v. Allen*, 408 F.3d at 1273; *Rupe*

18   *v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

19      **B.**    **Claim 4 - Appellate Counsel's Performance**

20      Petitioner's claim that appellate counsel failed to raise claims 1 and 2 on appeal are

21   meritless for the same reason as discussed above, *i.e.*, for failure to show prejudice.

22      To determine whether appellate counsel's failure to raise claim 3 – ineffective

23   assistance of trial counsel – was objectively unreasonable and prejudicial, the district court

24   must first assess whether the merits of the underlying claim that trial counsel provided

25   constitutionally deficient performance. *Moormann v. Ryan*, 628 F.3d 1102, 1106-07 (9th Cir.

26   2010). If trial counsel's performance was not objectively unreasonable or did not prejudice

27   the petitioner, then it cannot be said that appellate counsel acted unreasonably in failing to

28   raise a meritless claim of ineffective assistance of counsel nor was petitioner prejudiced by

1  appellate counsel's omission. *Id.*

2       As discussed above, trial counsel did not render ineffective assistance with respect to

3  claims 1 and 2, both of which this Court has determined are meritless claims. *See supra* at

4  15, 18. Accordingly, it cannot be said that appellate counsel rendered ineffective assistance

5  by failing to raise an ineffective assistance of trial counsel claim on appeal. *Moormann*, 628

6  F.3d at 1106-07.

7       Petitioner's ineffective assistance of counsel claims are DENIED as without merit.

8  **III.    Improper Jury Instructions (Claims 5 and 6)**

9       Under claim 5, Petitioner claims that the jury was improperly instructed on the intent

10 element of the substantive gang offense (Pen. Code § 186.22, subd. (a)), asserting that the

11 statute required the jury to find that Petitioner acted with the intent to benefit the criminal

12 street gang rather than to benefit an individual gang member. Pet. Attach. at 36. Petitioner

13 relies on *People v. Ramirez*, 172 Cal.App.4th 1018 (2009), in which the state appellate court

14 found that § 186.22, subdivision (a) requires the jury to find beyond a reasonable doubt that a

15 defendant's conduct was intended to benefit his criminal street gang. *Id.* at 36-37. Petitioner

16 claims ineffective assistance of counsel under claim 6 for his trial counsel's failure to object

17 to the alleged instructional error and his appellate counsel's failure to raise the claim on

18 appeal.

19       Essentially, Petitioner is attacking the statute itself as being constitutionally deficient

20 rather than a particular jury instruction. The interpretation of a state statute by the highest

21 state court is binding on federal courts. *See Johnson v. Fankell*, 520 U.S. 911, 916 (1997).

22 Neither the United States Supreme Court nor any other federal tribunal has any authority to

23 place a construction on a state statute different from the one rendered by the highest court of

24 the state. *See id.* Respondent contends that *Ramirez* was depublished by the California

25 Supreme Court on July 8, 2009, and moreover, that the premise of Petitioner's argument was

26 later expressly rejected by the state high court in *People v. Albillar*, 51 Cal.4th 47, 55-59

27 (2010). Ans. at 18-19. The state high court in *Albillar* expressly rejected defendants' claim

28 that the § 186.22, subdivision (a) included "an unwritten requirement that the 'felonious

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  criminal conduct' that is promoted, furthered, or assisted be gang related." 51 Cal.4th at 51.
2  The court found no ambiguity in the language of the statute, nor in the legislative history of
3  the law defining the substantive offence and the Legislature's intent, and concluded that a
4  literal interpretation of the plain language would not yield absurd results: "there is nothing
5  absurd in targeting the scourge of gang members committing *any* crimes together and not
6  merely those that are gang related." *Id.* (emphasis in original). The state high court further
7  stated: "Crimes committed by gang members, whether or not they are gang related or
8  committed for the benefit of the gang, thus pose dangers to the public and difficulties for law
9  enforcement not generally present when a crime is committed by someone with no gang
10  affiliation." *Id.*

11      The California Supreme Court also found that the statute did not violate the federal
12  constitution, rejecting the defendants' argument that it created a "status offense." *Id.* at 57.
13  Rather, the court found that §186.22 requires both active participation in the gang and guilty
14  knowledge of the gang's criminal activities, and that the statute not only links "criminal
15  liability to a defendant's criminal conduct in furtherance of a street gang," but also "reaches
16  only those street gang participants whose gang involvement is, by definition, 'more than
17  nominal or passive.'" *Id.* at 58. Petitioner's reliance on *Ramirez* is clearly misplaced.

18      Furthermore, Petitioner's argument that the instructional error violated due process
19  under *Neder v. United States*, 527 U.S. 1 (1999), is without merit. Pet. Attach. at 37. *Neder*
20  holds that a jury instruction that omits an element of an offense is constitutional error. 527
21  U.S. at 8-11. There is no such error here, as the state high court found that the plain language
22  of §186.22, subd. (a) includes a specific intent element. A state court's interpretation of state
23  law, including one announced on direct appeal of the challenged conviction, binds a federal
24  court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*,
25  485 U.S. 624, 629 (1988). The state's highest court is the final authority on the law of that
26  state. *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979). Accordingly, Petitioner's claim
27  that the jury was misinstructed with respect to § 186.22, subd. (a) is without merit.
28      Because the underlying claim is without merit, Petitioner's ineffective assistance of

United States District Court

For the Northern District of California

1  counsel claim also fails. *See Juan H.*, 408 F.3d at 1273; *Moormann*, 628 F.3d at 1106-07.

2  **IV.   Fundamentally Unfair Trial (Claim 7)**

3       Petitioner claims that based on the merits of his earlier claims, his non-gang

4  convictions – murder, attempted murder, assault and other charges – must also be reversed

5  because the admission of the gang evidence tainted his ability to receive a fair trial on the

6  remaining charges. Pet. Attach. at 40. Petitioner states that the "root of the problem... is the

7  bogus nature of the Uber-Norteno CSG construct the prosecution was permitted to proceed

8  on" and that the prosecution should have been limited to proving predicate crimes in which

9  Petitioner had been actively involved. *Id.*

10       Respondent contends that the pattern of criminal gang activity proving "predicate"

11  crimes can be "established by evidence of the offense with which the defendant is charged

12  and proof of another offense committed on the same occasion by a fellow gang member."

13  Ans. at 20-21, citing *People v. Loeun* (1997) 7 Cal.4th 1, 5. Therefore, Respondent argues,

14  the knowledge element was satisfied in Petitioner's case, "where a defendant commits an

15  assault with a deadly weapon as he is outside standing guard a residence while his cohorts are

16  inside committing murder and attempted murder." *Id.* at 21. Respondent points out that

17  Petitioner's trial counsel argued to the jury that Petitioner had no knowledge of his

18  codefendant's "secret plan" to kill Figueroa, and that the prosecutor was able to argue

19  otherwise based on the surrounding circumstances, including Petitioner's possession of two

20  knives, his concerted nunchakus attack, his numerous statements before the crime and

21  admissions immediately thereafter. *Id.* Therefore, it was an issue properly before the jury to

22  decide either way. *Id.*

23       Petitioner's reliance on the merits of his other claims to bolster this claim is

24  unfounded. As discussed in Petitioner's prior claims, there was no due process violation with

25  respect to Petitioner's gang-related charges as there was more than sufficient evidence to

26  support the substantive gang charge. *See supra* at 15-16. Petitioner failed to show that the

27  admission of allegedly irrelevant or overtly prejudicial evidence of gang participation

28  rendered his trial "fundamentally unfair." *Id.* Furthermore, this Court is not persuaded that

United States District Court

For the Northern District of California

1   the admission of evidence, more than sufficient at that, to prove legitimately filed charges

2   somehow violated due process on the grounds that it tainted the jury's ability to be objective

3   with respect to the other charges.  The jury acquitted Petitioner on the gang special

4   circumstance and enhancement allegations while finding him guilty of the substantive gang

5   charge, which indicates that it was able to objectively consider the relevant evidence with

6   respect to each charge.  As discussed above, the Court rejected Petitioner's argument that the

7   jury's guilty verdict on the substantive gang charge and concurrent rejection of the special

8   circumstance and enhancement allegations indicates that the jury was unduly prejudiced by

9   the gang evidence because the different verdicts show that the jury understood that the

10  charges required different types of intent and that it found the prosecution's case with respect

11  to the periphery charges lacking.  *See supra* at 18.  The Court is not convinced that there was

12  any error in the admission of the gang evidence that resulted in a denial of the fundamentally

13  fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d at 1031.  Accordingly,

14  the state courts' rejection of this claim was not contrary to, nor an unreasonable application

15  of, Supreme Court precedent.

16  **V.      Failure to Exclude Evidence (Claim 9)**

17          Petitioner claims that the admission into evidence of two knives found during the

18  search of his bedroom after the murder violated due process.

19          The Court of Appeal rejected this claim and found that the knives were properly

20  admitted:

21          The police recovered two knives from Bray's bedroom when he was arrested
            the morning after the Cloverdale apartment stabbings, and the knives were
22          admitted in evidence at trial. The police also saw a knife next to Tamez's living
            room couch when he was arrested that same morning, and a photograph of that
23          knife was likewise admitted in evidence. Defendants Bray and Tamez contend
            that this evidence was irrelevant and wrongly admitted because the knives
24          could not have been used to stab the victims. The contention is unsupported by
            the record.
25
            Generally, all relevant evidence is admissible in evidence. (Evid. Code, § 351.)
26          "Relevant evidence is evidence 'having a tendency in reason to prove or
            disprove any disputed fact that is of consequence to the determination of the
27          action.'" (*People v. Farnam* (2002) 28 Cal.4th 107, 156, quoting Evid. Code, §
            210.) A defendant's possession of a knife that could have been used in the
28          commission of a recent crime tends to prove that defendant was the perpetrator

and is thus relevant, admissible evidence. (*Farnam, supra*, 28 Cal.4th at pp. 156-157.) The prosecution need not conclusively connect a defendant's knife to the crime scene for the knife to be admissible in evidence. (*Id.* at p. 157.) "'If a victim's wound *could* have been caused by a specific type of weapon or instrument, such a weapon or instrument found in defendant's possession is admissible in evidence. Such a weapon or instrument is considered relevant on the theory that a trier of fact may reasonably draw an inference from defendant's possession of the weapon or instrument to the fact that he used the weapon or instrument to commit the offense – a disputed fact of consequence to the action.'" (*Ibid.*, italics in original.)

Defendant Tamez maintains that evidence of his knife possession was wrongly admitted because there was no evidence linking the knife with the charged crimes. The knife observed by the police when Tamez was arrested the morning after the stabbings had a serrated blade. The pathologist who studied the murder victim Figueroa's injuries testified that there was "no indication of a serrated knife being used." Defendant Bray makes the same argument against admission of one of his two knives, which also had a serrated blade. Bray further contends that his second knife was also inconsistent with the murder victim's wounds for the separate reason that the single-edged blade on that knife was only four inches long, and the pathologist testified that the knife used to inflict the murder victim's six-inch chest wound had to be at least four and one-half inches long. In fact, the record is equivocal on the dimensions of the second knife. A police officer testified that Bray's single-edged knife blade was "*approximately* 4 inches" long, which is close to the minimum length necessary to inflict the deepest of Figueroa's wounds. (Italics added.) More importantly, Figueroa also suffered shallower wounds that could have been caused by a knife with a blade length of four inches or less. In any event, defendants' focus upon Figueroa's injuries is misdirected because the evidence shows that any of the defendants' knives could have been used to stab the surviving victim, Sanchez.

Sanchez suffered multiple stab wounds of varying lengths up to five inches, and unmeasured depths that penetrated down through the skin and fatty tissue to the muscle. The knives found in defendants' possession hours after Sanchez was stabbed were consistent with such wounds. Defendants argue that general consistency is not enough, and that the prosecution was required to present evidence describing the type of knife used to inflict the victim's injuries to match defendants' knives to the injuries. Defendants are mistaken.

Evidence of knives belonging to a defendant are properly admitted at trial even though the knives cannot be directly or conclusively connected to the crimes. (*People v. Farnam, supra*, 28 Cal.4th at p. 157.) It is enough that defendants' knives could have caused the victim's injuries, even if many other knives could also have been used. (*Ibid.*) In *Farnam*, the California Supreme Court upheld admission of a knife found in defendant's possession two months after a homicide where the perpetrator cut the telephone cords and screen door at the victim's residence. (*Id.* at pp. 156-158.) The knife was held admissible because the blade's length and shape were similar to the slit in the screen door and the knife could have been used to cut the telephone cords, even though there was evidence that "any other sharp, single-bladed object, such as a scalpel, a kitchen knife, or part of a scissors blade, could also have cut the items." (*Id.* at pp. 156-157 & fn. 26.) The court concluded that the fact that many persons may possess a sharp instrument capable of cutting the cords and screen door may diminish the strength of the evidence, but it does not make it irrelevant. (*Id.* at

United States District Court

For the Northern District of California

1   p. 157.) Likewise, defendants' possession of knives that could have inflicted
2   Sanchez's injuries was relevant evidence and properly admitted even though
    the knives were not conclusively connected to the injuries sustained.

3   Aside from tending to prove that defendants Tamez and Bray were perpetrators
    of the attempted murder, the knife evidence was also properly admitted to
4   prove other disputed facts of consequence to the action. Defendants were
    charged with criminal street gang participation, and the gang expert testified
5   that it was common for gang members "to have weapons available inside their
    houses." The expert relied, in part, upon weapon possession to support his
6   opinion that defendants were active gang participants. Bray's possession of the
    single-edged knife was of special note because the knife sheath was carved
7   with gang insignia. Bray suggests that the sheath should have been offered in
    evidence without the knife. But the presence of the knife showed that Bray kept
8   a weapon readily available in his home, which the gang expert said was
    consistent with gang behavior. In any event, Bray's defense in a stabbing case
9   would not have been materially advanced by withholding the knife and
    presenting an empty Norteno-inscribed knife sheath to the jury. The knife
10  evidence was properly admitted.

11  Pet. Ex. A at 13-16.

12          Petitioner's claim fails because he fails to show that the state court erred in admitting

13  the knives into evidence.  As discussed by the state appellate court, the evidence was

14  inconclusive as to whether the murder victim was stabbed with only a single knife or multiple

15  knives.  The prosecution's theory was that the evidence was consistent with there being more

16  than one knife used during the stabbings.  Therefore, evidence of knives in the possession of

17  the other potential assailants was relevant to prove that those other assailants were also

18  involved in the stabbings.  Furthermore, at least one of the knives, which had gang insignia

19  carved into the sheath, was also relevant in proving Petitioner's involvement in a street gang

20  if not the stabbings.  Accordingly, Petitioner's claim that the knives were irrelevant is

21  without merit.

22          Furthermore, even if an evidentiary error is of constitutional dimension, the court must

23  consider whether the error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

24  *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001).  Here, there was more than enough

25  evidence other than the knives to show that Petitioner was involved in the attack at

26  Cloverdale apartment: (1) one of the codefendant's girlfriend testified at trial about driving

27  the three defendants to the Cloverdale apartment and that they were involved in an attack of

28  the victims; (2) the codefendants made statements about their actions in the car; (3) the

26

surviving victims identified the codefendants as their attackers; (4) witnesses identified Petitioner yelling and gesturing prior to the attack; (5) forensic evidence connected Petitioner to the scene; and (6) Petitioner's counsel conceded in closing argument that Petitioner was present at the scene. Accordingly, it cannot be said that the admission of weapons which may or may not have been used in the attack had a prejudicial impact on the jury's verdict; the admission of the knives into evidence was therefore harmless. The state courts' rejection of this claim was not contrary to, nor an unreasonable application of, Supreme Court precedent.

## VI.   Cumulative Error (Claim 10)

Petitioner's cumulative error argument is also without merit. A cumulative error claim allows for habeas relief when, although no single error independently warrants reversal or rises to the level of a constitutional violation, the effect of multiple errors caused the petitioner to suffer undue prejudice. *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("Where ... there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors" in the trial). However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

Here, Petitioner has failed to demonstrate even a single constitutional error that had a prejudicial effect. *Id.* The state court's rejection of this claim was not contrary to or an unreasonable application of Supreme Court precedent. Accordingly, his claim of cumulative error is DENIED.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

1    The clerk shall enter judgment and close the file.

2    IT IS SO ORDERED.

3    DATED: _____ AUG 3 0 2012

4                                              JEFFREY S. WHITE
                                               United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

28

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


RONALD JAMES BRAY,

            Plaintiff,

   v.

GEORGE NEOTTI et al,

            Defendant.
_____/

Case Number: CV09-01898 JSW

**CERTIFICATE OF SERVICE**


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 30, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Ronald James Bray
V58248
5150 O'Byrnes Ferry Road
Jamestown, CA 95327

Dated: August 30, 2012

*Jennifer Ottolini*
Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk